UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In the matter of:

SHANEESE LOVE WILLIAMS,

                        Debtor.   /

BELFOR USA GROUP, INC.,

                  Plaintiff(s),

vs.

SHANEESE LOVE WILLIAMS,

                  Defendant(s).   /

Case No. 09-56483

Chapter 7

Judge Thomas J. Tucker

Adv. Pro. No. 09-5821

**TRIAL OPINION**

In this adversary proceeding, Plaintiff Belfor USA Group, Inc. ("Belfor") seeks a money judgment against Defendant-Debtor Shaneese Williams ("Debtor") for damages due to Debtor's alleged conversion of certain property belonging to Belfor. And Belfor seeks a determination that this debt is nondischargeable in Debtor's Chapter 7 bankruptcy case, under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).

The Court conducted a bench trial, and took the matter under advisement. This opinion states the Court's findings of fact and conclusions of law.

For the reasons stated below, the Court finds for Debtor, and will enter judgment for Debtor, dismissing Belfor's claims with prejudice.

**I. Jurisdiction and venue**

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)(E.D. Mich.). With respect to each of

the three counts in Belfor's First Amended Complaint, this is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue is proper under 28 U.S.C. § 1409(a), and is not disputed.

## II. Discussion

### A. Plaintiff Belfor's burden of proof

Exceptions to discharge under § 523(a) "are to be strictly construed against the creditor." *Rembert v. AT&T Universal Card Servs., Inc.* (*In re Rembert*), 141 F.3d 277, 281 (6th Cir. 1998) (citing *Manufacturer's Hanover Trust v. Ward* (*In re Ward*), 857 F.2d 1082, 1083 (6th Cir. 1988)). The creditor must prove each of the elements under the asserted provision of § 523(a) by a preponderance of the evidence. *Id*. (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

### B. Facts

On September 28, 2006, Debtor's home, located at 12598 Plumbrook Road, Sterling Heights, Michigan, was severely damaged by fire. Debtor's home was insured by State Farm Fire & Casualty Insurance Company ("State Farm"), and encumbered by a mortgage then held by Countrywide Home Loans ("Countrywide"). The Debtor and State Farm hired Belfor to repair Debtor's home. On October 6, 2006, Debtor signed a document prepared by Belfor, entitled "Work Authorization."[1] In this document, Debtor authorized Belfor "to provide all labor, equipment, and materials to properly repair" her home.[2] The Work Authorization contained language by which, according to Belfor, Debtor assigned to Belfor all of her rights to insurance policy proceeds for work to be performed on the home by Belfor that was covered by the State

---

[1] Plaintiff's Exhibit 1 is a copy of the Work Authorization. (Plaintiff's trial exhibits will be cited in this opinion as "PX-__".)

[2] PX-1.

2

Farm insurance policy.[3] That language stated:

> The undersigned hereby transfers, assigns and conveys to Contractor his/her/their right, title and interest in and to the insurance policy proceeds and all drafts for work performed or to be performed by Contractor. Accordingly, undesigned authorizes and directs their insurer (named below) to make "Belfor USA" a payee on all insurance drafts for all insurance work performed by Contractor on the above damaged property. The undersigned also agrees to immediately endorse and tender all drafts as produced to the Contractor.
> . . .
> Owner agrees . . . to assist with obtaining any third party payee signatures on all insurance drafts so that Belfor can be timely paid. If for any reason your claim is denied by your insurance carrier or they refuse to pay the costs of any and/or all insurance work performed by Contractor, or you otherwise delay or prevent the payment of said insurance draft, or use it for other purposes, then the insured/owner(s) of the above mentioned property will be personally liable for all costs of services performed.[4]

Belfor performed some emergency repairs shortly after the fire, in order to secure the home, which Debtor and her family had to vacate while repairs were being done. Sometime in early 2007, Belfor resumed doing repair work on Debtor's home, and by November 2008 Belfor had substantially completed its repair work. As of November 2008, however, Debtor had a list of uncompleted items and/or complaints about Belfor's work. The Debtor and Belfor never fully resolved the Debtor's dispute with Belfor about the incomplete items and Debtor's complaints about Belfor's work. Debtor filed her Chapter 7 bankruptcy case on May 26, 2009.

The repair work on Debtor's home was paid for, in part, by insurance proceeds from State Farm, and in part by the Debtor's own funds (for additional work that Debtor requested that was

---

[3] Debtor disputes Belfor's interpretation of these provisions in the Work Authorization.

[4] PX-1.

3

not covered by Debtor's insurance). As of November 14, 2008, Belfor invoiced Debtor a total of $179,446.34, less $6,095.09 in credits for "[r]epairs not performed by Belfor," for a total invoice amount of $173,351.25. Of this amount, according to Belfor's invoice, as of November 14, 2008, Debtor still owed Belfor a total amount of $79,098.72, after crediting payments received by Belfor from State Farm insurance proceeds and from Debtor's own funds.[5]

### C. Belfor's claims

Belfor's claims in this adversary proceeding, including all of its nondischargeability claims, are based on Belfor's allegation that Debtor obtained and used, for purposes other than paying Belfor, some of the insurance proceeds disbursed by State Farm. Belfor alleges that these insurance proceeds were its property, based on the assignment language in the Work Authorization quoted above, and that Debtor had a duty to deliver those proceeds to Belfor. Belfor claims that Debtor's failure to turn these insurance proceeds over to Belfor amounted to a conversion of Belfor's property, fraud against Belfor, and a willful and malicious injury to Belfor's property. Belfor seeks a judgment against Debtor in the amount of the allegedly converted insurance proceeds, trebled under the Michigan conversation statute, Mich. Comp. Laws Ann. § 600.2919a, plus interest and attorney fees. Belfor also seeks a determination that this debt is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) (for fraud); 523(a)(4) (for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny"), and 523(a)(6)(for willful and malicious injury to Belfor's property.)

Belfor claims that State Farm disbursed funds to the mortgagee, Countrywide, which acted as an escrow agent with respect to the insurance proceeds to be used for the home repairs,

---

[5] PX-8.

4

and that ultimately Countrywide (for reasons not explained by any evidence at trial) disbursed these insurance proceeds solely to Debtor, by means of several checks.

In Belfor's First Amended Complaint, Belfor alleged that these converted insurance proceeds total $68,881.00, and alleged the following:

> 32. On or about August 7, 2007 . . . Countrywide, without Belfor's knowledge or consent, released all remaining funds in the escrow account, approximately $68,881.00 to the Defendant.
>
> 33. At the time the funds were disbursed to the Defendant by Countrywide, the Defendant was indebted to the Plaintiff in the amount of Eighty Thousand Seventy Three and 72/100 Dollars ($80,073.72).
>
> 34. On or about August 7, 2007, without Belfor's consent, the Defendant wrongfully obtained the insurance proceeds from State Farm without endorsing them and tendering them over to Belfor.[6]

In describing its claims in the Final Pretrial Order that was filed in this case on June 7, 2010, however, Belfor alleged that the amount of converted insurance proceeds was at least $80,073.72:

> . . . the Defendant still owes the Plaintiff $80,073.72 for the materials and services provided. The Defendant has failed, neglected, or refused to pay the outstanding balance to the Plaintiff after repeated requests to do so even though State Farm Fire and Casualty Insurance Company, the Defendant's insurer, paid sufficient funds to the Defendant to satisfy the outstanding debt to the Plaintiff. Rather than pay the Plaintiff, which were transferred, assigned and conveyed to the Plaintiff by the agreement between the parties, the Defendant knowingly and intentionally converted the funds to her own use, to the detriment of the Plaintiff.[7]

---

[6] Plaintiff's First Amended Complaint (Docket # 31) at ¶¶ 32-34.

[7] Final Pretrial Order (Docket # 57) at 2.

Later, in its trial brief filed shortly before trial, Belfor alleged that the total amount of converted insurance proceeds was $81,979.66, from four checks that Countrywide issued to the Debtor that were payable to the Debtor alone:

> In June of 2007, Countrywide Home Loans (Countrywide) issued checks to Shaneese Williams which were payable to Shaneese Williams alone in the amounts of $12,689.83, 11,600.20, 51,000.00 and in March of 2008, $6,689.83 for a total of $81,979.66. Thereafter in 2008 and in early 2009, the Plaintiff requested payment from Countrywide and the Defendant for services rendered and was informed by Countrywide that the funds were turned over to the Defendant. After repeated requests to do so, the Defendant failed, neglected or refused to pay the outstanding balance to the Plaintiff.[8]

**D. The evidence at trial and Belfor's failure to meet its burden of proof**

In closing argument at trial, Belfor's counsel argued that Debtor received a series of checks from Countrywide that totaled "in the neighborhood of $80,000.00," and asked the Court for a judgment of treble damages in the amount of $240,000.00.[9] When the Court asked Belfor's counsel what evidence supported the assertion that Debtor received this $80,000.00 in insurance proceeds, Belfor's counsel stated that the only evidence of this at trial was the Debtor's testimony — specifically, "Ms. Williams' own testimony. I went through each of the checks with her and she indicated that she **could** have received those funds."[10]

Having carefully reviewed all of the evidence presented at trial, including both the testimony and the exhibits admitted into evidence, the Court finds and concludes that Belfor has

---

[8] [Plaintiff's] Trial Brief (Docket # 59) at 3.

[9] Trial transcript (Docket # 70) at 88, 92. (In this opinion, the trial transcript is cited as "Tr. __").

[10] Tr. at 88, 89 (emphasis added).

6

not met its burden by proving, by a preponderance of the evidence, that Debtor received from Countrywide insurance proceeds that belonged to Belfor, or in which Belfor had any security interest or other property interest, in any amount. And in any event, Belfor has failed to meet its burden of proving, by a preponderance of the evidence, the *amount* of any such proceeds. The only evidence cited by Belfor on this subject in its closing argument, and indeed the only evidence on this subject presented at trial, was the following testimony by the Debtor:

> Q Okay. Did they reimburse –- did they -– did there ever come a time when Countrywide released the balance of the escrow that they had to you?
>
> A Whether it was the balance, I don't know. I can't tell you that.
>
> Q Did they release any funds to you?
>
> A They released funds, but there were other contractors involved.
>
> Q Okay. And how much was the funds that they released to you?
>
> A **I don't know.**
>
> Q That would have been in June of 2007?
>
> A Quite possibly, yes.
>
> Q Okay. In June of 2007, did they release funds to you that totaled more than $50,000?
>
> A **I don't know**. I was living in a hotel room. I didn't have a way of organizing anything. **I don't know. I couldn't speculate. Possibly, I don't know.**
>
> Q Okay. So if they had given you $50,000 you wouldn't remember that?
>
> A If they had given me $50,000 would I have remembered them releasing funds of that amount? Quite **possibly**. Again, part of -– never mind.
>
> . . .
>
> Q Do -- did you receive a check on June 6th of 2007 in the amount of $12,689.83?

A I – **I don't know.**

Q Okay. Did you receive a check in June of 2007 in the amount of $11,600?

A It's quite **possible**.

Q Okay. Did you receive a check in June of 2007 of $51,000.00?

A It's quite **possible**.

Q Okay.

A Whether - -

Q And in March of 2008, did you receive a check of $6,689.83?

A **I'm not certain of the dates.**

Q Okay.

A **Or the amounts.**

Q Okay.

A **Or what they were for.**

. . .

Q Okay. And then was Belfor the only contractor that ever worked on your house?

A No.

Q How could other contractors come to work at your house?

A Because there was such a delay and misinformation given, I started pulling projects away from Belfor.

Q Okay. And then how were these contractors paid?

A They were supposed to be paid directly by me from my insurance proceeds.

Q Okay. And then how did you get a hold of these insurance proceeds?

8

A  From State Farm.

Q  Okay. And then -- so then you received funds from State Farm for -- for other contractors. Did you ever receive any money from Countrywide?

A  **I'm not sure.**

Q  You're not sure.

A  I did receive checks from Countrywide, **but what they were for, I'm not certain**.

Q  Okay. And then whose name was on those checks?

A  Most of the time they were just to me.

Q  Okay. If somebody else's name would have been on the checks, whose name?

A  I would have had to sign the check and then submit it to whoever it was for because that would have told me that that was specifically for that particular company. I was only supposed to authorize it.

Q  Okay.

A  There was nothing I could do with a check that had someone else's name on it.

Q  Okay. And then the checks that only had your name on those, did State Farm give you any notice that they were not for you to use for the damages?

A  No.

Q  I mean **Countrywide tell you that those were not to use for other contractors?**

A  **No. There was no specifications.**

. . .

Q  Okay. You used the funds that you received from Countrywide to pay other contractors to complete the job?

A  Yes. **If that's where they came from, yes.**[11]

---

[11]  Tr. at 66-67, 74-75, 80 (emphasis added).

9

The most that this testimony shows is that Debtor does not know whether she received any of the particular Countrywide checks mentioned, and does not know if she received checks or insurance proceeds from Countrywide, or in what amount. Debtor testified that it was "possible" that she received one or more checks from Countrywide. But she also testified that some of the insurance proceeds were to be used by Debtor to pay contractors other than Belfor who did work on her home. And Debtor testified that she does not know what proceeds she received from Countrywide, if any, that were paid to other contractors.

This evidence is insufficient to meet Belfor's burden of proof by a preponderance of the evidence. It shows, at most, what is *possible* — not what is more probable than not. Nor was there any other evidence presented at trial by which Belfor met its burden by proving, by a preponderance of the evidence, that Debtor converted Belfor's property by receiving and retaining or misappropriating insurance proceeds from Countrywide.[12] Furthermore, even if Belfor had met its burden of proving that Debtor did receive and misappropriate or convert some insurance proceeds, Belfor has failed to meet its burden by proving, the *amount* of such proceeds.

Thus, Belfor has failed to meet its burden of proving any of its claims by a preponderance of the evidence. As a result, the Court must find for the Defendant Debtor, and enter judgment for Debtor in this adversary proceeding on all of Belfor's claims.[13]

## III. Conclusion

Based on the findings of fact, conclusions of law, and the reasons stated in this opinion,

---

[12] For example, there were no copies of Countrywide checks presented as evidence at trial.

[13] Because of the Court's disposition of this case, it is not necessary to discuss various other defenses asserted by Debtor.

the Court will enter judgment for Debtor, dismissing Belfor's claims with prejudice.

**Signed on April 8, 2011**  /s/ Thomas J. Tucker
**Thomas J. Tucker**
**United States Bankruptcy Judge**

11

09-05821-tjt    Doc 73    Filed 04/08/11    Entered 04/08/11 17:53:20    Page 11 of 11